# United States Court of Appeals for the Fifth Circuit

No. 25-30509

United States Court of Appeals
Fifth Circuit

**FILED**
April 1, 2026

Lyle W. Cayce
Clerk

Rachel E. Goodley,

*Plaintiff—Appellant*,

*versus*

Supreme Rice, L.L.C.; Arch Insurance Company,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:24-CV-1155

———————————————————

Before Richman, Duncan, and Oldham, *Circuit Judges*.

Per Curiam:[*]

Rachel Goodley is an inspector for the Federal Grain Inspection Service, a division of the Department of Agriculture. Pursuant to her duties as a federal employee, Goodley was grading rice on site at Supreme Rice when an employee of Supreme Rice drove a forklift over her foot. She sued Supreme Rice in Louisiana state court, asserting several tort claims.

———————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-30509

Supreme Rice removed the case to federal court and moved for summary judgment, which the district court granted.  We affirm.

**I**

"The Federal Grain Inspection Service (FGIS) facilitates the marketing of U.S. grain and related products by establishing standards for quality assessments, regulating handling practices, and managing a network of Federal, State, and private laboratories that provide impartial official inspection and weighing services."[1]  FGIS inspections of rice are performed only upon request.  However, foreign purchasers of rice often require an FGIS inspection as a term of the purchase contract.  After the inspection, the inspector issues a Rice Inspection Services Certificate, which enumerates—among other things—the percentage of kernels that are heat-damaged, chalky, or broken.  FGIS inspections may be conducted either by FGIS itself or by entities licensed by FGIS.  To ensure a timely inspection and obtain lower inspection charges, a rice exporter may "enter into a contract service agreement with the [FGIS] field office."

Supreme Rice is a major rice exporter in Louisiana.  In 2020, Supreme Rice entered a long-term Contract Service Agreement with FGIS.  In 2023, it contracted with Agrocomercial Los Samanes SA to export six thousand metric tons of rice to the Dominican Republic.  This contract required Supreme Rice to provide FGIS certificates attesting that the rice was pest-free and of the agreed-upon grade.

In accordance with the Contract Service Agreement, FGIS dispatched Rachel Goodley to inspect the rice being exported to the Dominican

---

[1] *Federal Grain Inspection Service*, U.S. Dep't of Agric., https://www.ams.usda.gov/about-ams/programs-offices/federal-grain-inspection-service [https://perma.cc/7VX7-ZA6T] (last visited March 30, 2026).

No. 25-30509

Republic. Goodley was performing her duties when a Supreme Rice employee ran over her foot with a forklift. She made a claim under the Federal Employees' Compensation Act for her injuries, and she sued Supreme Rice in Louisiana state court. Supreme Rice removed the case to federal court. The district court granted summary judgment to Supreme Rice, finding that Louisiana's worker compensation scheme provided the exclusive remedy against Supreme Rice for Goodley's injuries. The court then denied Goodley's motion for reconsideration. Goodley timely appealed.

## II

We review a district court's grant of summary judgment de novo.[2] Summary judgment is proper when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law.[3]

The question in this appeal is whether Louisiana's workers' compensation scheme bars Goodley's recovery in tort. Generally, an employer who is liable to pay workers' compensation is afforded a corresponding immunity in tort:

> [Workers' compensation] legislation reflects a compromise between the competing interests of employers and employees: the employer gives up the defense it would otherwise enjoy in cases where it is not at fault, while the employee surrenders his or her right to full damages, accepting instead a more modest claim for essentials, payable regardless of fault and with a minimum of delay.[4]

_____

[2] *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

[3] Fed. R. Civ. P. 56(a).

[4] *Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Auth.*, 2002-1072 (La. 4/9/03), 842 So.2d 373, 377.

No. 25-30509

This was not always the case. At their inception in the early twentieth century, workers' compensation schemes were enacted "not to abrogate existing tort remedies that afforded protection to workers, but to provide social insurance to compensate victims of industrial accidents because it was widely believed that the limited rights of recovery under tort law were inadequate to protect these individuals."[5] Because these schemes imposed additional liability on employers, legislatures were concerned that employers would circumvent them. One method an employer could use to avoid compensation liability was "interposing an independent contractor or sub-contractor between itself and its injured worker."[6] "The statutory solution, adopted by most state compensation laws, was to deem an entity that attempted to evade compensation responsibility to be a statutory employer and to impose contingent compensation responsibility on that entity."[7] In Louisiana, the "statutory employer" concept is codified at LA. STAT. ANN. § 23:1061. "The original purpose of Section 1061 clearly was to preclude a principal from contracting out 'the essential economic activities

_____

[5] *Id.*; *see also Kirkland v. Riverwood Int'l USA, Inc.*, 95-1830 (La. 9/13/96), 681 So.2d 329, 331-32 ("Nothing in the Act expressly provided, or even suggested, that a principal was entitled to any tort immunity, even if the principal actually had to pay compensation benefits to an injured employee."); *Roberts v. Sewerage & Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So.2d 341, 345 (explaining that workers' compensation arose in response to dissatisfaction with "[t]he so-called 'unholy trinity' of judicially-created employer defenses (assumption of the risk, contributory negligence and the fellow servant rule) [which] were developed and strictly enforced as legal rules in the last half of the nineteenth century").

[6] *Kirkland*, 681 So.2d at 331.

[7] *Id.*

4

of an enterprise to impecunious sub-contractors so as to exculpate himself from compensation liability.'"[8]

In this case, Supreme Rice has deployed the statutory employment concept defensively. "Although statutory employment renders a principal responsible in workers' compensation, it also provides corresponding tort immunity."[9] Supreme Rice argues that Goodley is its statutory employee. Therefore, it is liable, if at all, for workers' compensation—and *only* workers' compensation. Louisiana courts strictly construe immunity statutes against the party claiming the immunity, and an employer who wishes to claim tort immunity "bears the burden of proving its entitlement to immunity."[10] "[E]very presumption should be on the side of preserving the general tort or delictual rights of an injured worker against the actual wrongdoer, in the absence of explicit statutory language limiting or excluding such rights."[11]

## III

Supreme Rice may invoke the statutory employer concept in one of two ways. It may argue that it, as principal, has "undertake[n] to carry out any work which is a part of [its] trade, business, or occupation by means of a contract with another."[12] This is the "trade, business, or occupation"

---

[8] *Id.* (quoting *Meche v. Farmers Drier & Storage Co.*, 193 So.2d 807, 809 (La. App. 3 Cir. 1967)).

[9] *McBride v. Old Republic Ins. Co.*, 2024-01519 (La. 6/27/25), 413 So.3d 452, 469.

[10] *Badeaux v. St. Tammany Par. Hosp. Serv. Dist. No. 1*, 2021-1229 (La. App. 1 Cir. 6/3/22), 343 So.3d 230, 234.

[11] *Roberts v. Sewerage & Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So.2d 341, 346.

[12] *Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Auth.*, 2002-1072 (La. 4/9/03), 842 So.2d 373, 378.

defense.[13] Alternatively, it may argue that it has "contracted to perform work and sub-let[] any portion to another."[14] This is the "two-contract" defense.[15] These defenses are conceptually distinct. It is irrelevant for the two-contract defense whether the subcontractor's work is part of the ordinary trade, business, or occupation of the employer.[16]

Supreme Rice has invoked the two-contract defense. "The purpose behind the two contract theory is to establish a compensation obligation on the part of the principal who contractually obligates itself to a party *for the performance of work* and who then subcontracts with intermediaries whose employees perform *any part of that work*."[17] The defense is codified at La. Stat. Ann. § 23:1061(A)(2): "A statutory employer relationship shall exist whenever the services or work provided by the immediate employer is contemplated by or included in a contract between the principal and any person or entity other than the employee's immediate employer."[18] As interpreted by Louisiana courts, this requires that the principal be sandwiched between two contracts:

> The "two contract" defense applies when: (1) the principal enters into a contract with a third party; (2) pursuant to that contract, work must be performed; and (3) in order for the

_____

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 378-79 ("As to the 'two contract' theory of the statutory employer defense, it is irrelevant whether the subcontractor's work is part of the work ordinarily performed by the principal. In fact, the law presumes the contract to be within the trade, business or occupation of the principal.").

[17] *Badeaux v. St. Tammany Par. Hosp. Serv. Dist. No. 1*, 2021-1229 (La. App. 1 Cir. 6/3/22), 343 So.3d 230, 236.

[18] La. Stat. Ann. § 23:1061(A)(2) (2025).

principal to fulfill its contractual obligation to perform the work, the principal enters into a subcontract for all or part of the work performed.[19]

Supreme Rice argues that each of these requirements have been met. Supreme Rice entered into a contract with Agrocomercial Los Samanes SA. That contract required the delivery of six thousand metric tons of rice with an FGIS inspection certificate. In order to fulfill its contractual obligations, Supreme Rice contracted with FGIS to perform the FGIS inspection. Therefore, it argues, it may invoke the protection of the two-contract defense.

Goodley does not dispute the first element—that Supreme Rice entered into a contract with Agrocomercial Los Samanes SA. The other two elements are at issue.

## A

As to the second element, Goodley contends that the contract between Supreme Rice and Agrocomercial Los Samanes SA does not require that work be performed. She argues that Supreme Rice was not hired to "perform work" but rather to provide a product: rice, plus an inspection certificate attesting to its quality. Supreme Rice was not contractually obligated to perform the inspection itself; the contract explicitly contemplated that FGIS would inspect the rice. However, Supreme Rice was contractually obligated to ship inspected rice. To fulfill its contractual obligation to perform *that* work, it contracted with FGIS to perform the required inspection.[20]

---

[19] *Allen*, 842 So.2d at 379.

[20] *See* 14 H. ALSTON JOHNSON III, LOUISIANA CIVIL LAW TREATISE: WORKERS' COMPENSATION LAW AND PRACTICE § 364, n.57 (5th ed. Supp. 2025) (describing "an inquiry of whether [the principal] had agreed to 'perform' the services in

No. 25-30509

**B**

Goodley also challenges the third element of the two-contract defense: "in order for the principal to fulfill its contractual obligation to perform the work, the principal enters into a subcontract for all or part of the work performed."[21]

First, Goodley appeals to caselaw governing the "trade, business, or occupation" defense to argue that, under the totality of the circumstances, no statutory employer relationship existed. However, Supreme Rice has asserted the "two-contract" defense, not the "trade, business, or occupation" defense. They are analytically distinct.[22]

Second, Goodley argues that the service agreement between Supreme Rice and FGIS did not constitute a contract within the meaning of the two-contract defense. This argument is inconsistent with Louisiana caselaw, which regards long-term service agreements as contracts under the two-contract defense.[23]

Finally, Goodley maintains that an employee of FGIS—a federal regulatory body—cannot be a subcontractor of Supreme Rice under the two-

---

question or merely to 'provide' them" as a "comparison . . . not found in the Act and . . . not particularly helpful").

[21] *Allen*, 842 So.2d at 379.

[22] *See id.* at 378-79 ("As to the 'two contract' theory of the statutory employer defense, it is irrelevant whether the subcontractor's work is part of the work ordinarily performed by the principal.").

[23] *See id.* at 382 ("[N]o reason has been advanced, nor can we fathom one, to support a finding that a principal who has a long-standing agreement with a supplier to provide labor and/or services in connection with jobs for which the principal contracts should be treated differently, for purposes of the compensation obligation, than one who enters separate contracts with the supplier after first contracting with a third party to perform certain work.").

8

contract defense.    That argument has some surface appeal.    Upon examination, however, we conclude that the unique nature of the relationship between FGIS rice inspectors and Supreme Rice compels the conclusion that the two-contract defense applies.

"The mission of the Federal Grain Inspection Service is to facilitate the marketing of grain, oilseeds, pulses, rice, and related commodities by . . . [a]ccurately and consistently certifying quality, [and] . . . [p]roviding for uniform official inspection and weighing . . . ."[24]    Among other goals, Congress intended that FGIS would facilitate the development of "new and wider markets for American agricultural products . . . with a view to making it possible for the full production of American farms to be disposed of usefully, economically, profitably, and in an orderly manner."[25]

Different statutes afford authority for the various services available through FGIS.    Its authority to provide inspection certificates for rice is derived from 7 U.S.C. § 1622(h), which authorizes the Secretary of Agriculture to "inspect, certify, and identify the class, quality, quantity, and condition of agricultural products when shipped or received in interstate commerce . . . *except that no person shall be required to use the service authorized by this subsection.*"[26]    The Secretary's inspection authority for grain, by

_____

[24] 7 C.F.R. § 800.1 (2026).

[25] 7 U.S.C. § 1621.

[26] 7 U.S.C. § 1622(h)(1) (emphasis added); *see also* 7 C.F.R. § 868.301 (2026), https://www.ecfr.gov/current/title-7/subtitle-B/chapter-VIII/subchapter-A/part-868/subpart-E/subject-group-ECFR3a64f8e5f1788c9/section-868.301 [https://perma.cc/HST9-FYLC] (editorial notes specify that the authority for promulgation of milled rice standards comes in part from 7 U.S.C. §§ 1621-1627); 7 C.F.R. § 868.21 (2026) (outlining requirements for obtaining an inspection service, which must be requested); U.S. Dep't of Agric., Rice Inspection Handbook A1-5 (Aug. 2020) (noting that "[a]ny interested person may request" an FGIS inspection).

contrast, derives from 7 U.S.C. § 77(a)(1), which *mandates* (with certain exceptions) the federal inspection and weighing of grain shipped outside the United States.[27]

Congress has thus provided that federal inspection of rice shipped abroad is wholly voluntary. A Rice Inspection Services Certificate smooths the path of commerce by providing assurance that a trained, neutral arbiter has assessed a given shipment. Foreign purchasers can be assured that they will receive the grade of American rice that they contracted for. However—unlike grain[28] or meat inspections[29]—contracting parties are free to forgo them.

The voluntary nature of the rice inspection program is a crucial distinction. Our conclusion is reinforced by the fact that FGIS inspectors are not the only source of Rice Inspection Services Certificates. FGIS also licenses non-FGIS employees to perform rice inspections and issue certificates.[30]

Goodley reasons that—should we accept Supreme Rice's argument today—tomorrow we would have to accept that the Department of Motor Vehicles (DMV) is a "subcontractor" of a trucking company that needs drivers with commercial driver's licenses to meet its contractual obligations

---

[27] 7 U.S.C. § 77(a)(1).

[28] *Id.*

[29] 21 U.S.C. § 603.

[30] *See* 7 C.F.R § 868.80 (2026) ("The Administrator may license any person to inspect commodities and to perform related services if the individual . . . [i]s employed by a cooperator, is a contractor, or is employed by a contractor. . . ."); *see also* 7 C.F.R § 868.41 (2026) ("Any interested person may enter into a contract with a cooperator or the Service whereby the cooperator or Service will provide original inspection services for a specified period, and the applicant will pay a specific fee.").

to its customers.  However, trucking companies and their customers cannot "opt out" of the requirement that truck drivers be licensed; rice buyers and sellers may freely opt out of FGIS rice inspections.  Additionally, DMV's obligations to the driving public arise from statute—not contract.  Goodley's DMV hypothetical would be one contract short of satisfying the two-contract defense.

Goodley argued in her motion for reconsideration that the Federal Employees' Compensation Act conflicts with Louisiana's workers' compensation scheme.  "[G]enerally speaking, we will not consider an issue raised for the first time in a Motion for Reconsideration."[31]  Even if we were to consider the argument, we disagree that a conflict exists in this case.  Under the Federal Employees' Compensation Act:

> If an injury or death for which continuation of pay or compensation is payable under this subchapter is caused under circumstances creating a legal liability on a person other than the United States to pay damages, the Secretary of Labor may require the beneficiary to . . . assign to the United States any right of action he may have to enforce the liability . . . .[32]

A subrogation obligation arises only "under circumstances creating a legal liability on a person other than the United States to pay damages," and it only extends to "any right of action  [the tort victim] may have to enforce the liability."[33]  The existence and extent of Supreme Rice's legal liability depends on state law.[34]  Under Louisiana law, liability in these circumstances

---

[31] *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999).

[32] 5 U.S.C. § 8131(a).

[33] *Id.*

[34] *See United States v. Lorenzetti*, 467 U.S. 167, 178 (1984) (noting that operation of FECA subrogation may vary based on "the provision's interaction with distinct state statutory schemes"); *id.* at 179 ("[T]he fact that changing state tort laws may have led to

is limited to compensation—not tort. We decline to address Goodley's argument that the Supremacy Clause prevents application of Louisiana's compensation scheme because she raises this argument for the first time on appeal.[35]

Finally, Goodley argues that letting Supreme Rice claim tort immunity as a statutory employer undermines the worker-protective purpose of workers' compensation statutes. However true that may be, the defensive invocation of statutory employer status is firmly established in Louisiana law.[36] "The principle that state courts are the final arbiters of state law is well-settled."[37] While this case presents a novel factual scenario, we conclude that, under Louisiana law, the two-contract defense applies.[38]

Our holding is narrow. We do not suggest that a regulated entity will always be a statutory employer of employees of federal regulatory bodies under a two-contract defense. At least one district court has held that a meatpacking plant was not the statutory employer of a federal meat inspector

---

unforeseen consequences does not mean that the federal statutory scheme may be judicially expanded to take those changes into account.").

[35] *See Grogan v. Kumar*, 873 F.3d 273, 277 (5th Cir. 2017).

[36] *See, e.g., Allen v. State ex rel. Ernest N. Morial-New Orleans Exhibition Hall Auth.*, 2002-1072 (La. 4/9/03), 842 So.2d 373, 383 (reinstating state district court's grant of summary judgment based on defensive invocation of statutory employer status).

[37] *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 629 (5th Cir. 2013).

[38] *See Little v. Llano County*, 138 F.4th 834, 876 (5th Cir. 2025) (HIGGINSON, J., dissenting) ("All legal rules have their nuances when applied to novel factual contexts, but it is our role to resolve those complexities to the best of our abilities."); *see also Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 565 (6th Cir. 2010) ("A novel question is not necessarily a difficult question; every application of settled law to a particular set of factual allegations is unique or novel in some respects.").

No. 25-30509

under a Virginia "trade, business, or occupation" law.[39]  We express no opinion as to whether a meatpacking plant would be the statutory employer of a federal meat inspector under Louisiana's or similar laws.  Statutory employer status "must be determined on the facts of each case."[40]  We hold only that—in the context of this specific arrangement—Goodley has failed to create a genuine issue of material fact as to whether LA. STAT. ANN. § 23:1061(A)(2)'s two-contract defense applies to Supreme Rice.

\*    \*    \*

The judgment of the district court is AFFIRMED.

---

[39] *See McCotter v. Smithfield Packing Co., Inc.*, 849 F. Supp. 443, 447-48 (E.D. Va. 1994) (rejecting argument that the meatpacking plant was statutory employer of a federal meat inspector under Virginia "trade, business, or occupation" provision).

[40] *Thomas v. Calavar Corp.*, 679 F.2d 416, 420 & n.6 (5th Cir. 1982) (collecting cases).